# CALL OPTION AGREEMENT

This Call Option Agreement (this "**Agreement**"), is made and entered as of February 18, 2021, by and between Jonathan B. Buckheit ("**Grantor**") and Andrew B. Conru ("**Grantee**").

WHEREAS, Grantor is purchasing 350,297 shares (the "**Shares**") of Common Stock, par value $0.001 per share of FriendFinder Networks Inc. (the "**Company**") from Kestrel I Industries LLC and Kestrel II Industries LLC pursuant to that certain Purchase and Sale Agreement dated of even date herewith (the "**Purchase Agreement**");

WHEREAS, it is acknowledged that Grantor is employed by the Company as its CEO; and

WHEREAS, following the purchase of the Shares, Grantee desires to have the right to purchase the Shares from Grantor, and Grantor desires to grant such right to Grantee, pursuant to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1. Grant of Call Option.

(a) Right to Purchase. Subject to the terms and conditions of this Agreement, for a period commencing on the date hereof and ending at the close of business on a date that is twelve (12) years from the date hereof (the "**Exercise Period**"), Grantee shall have the right from time to time (the "**Call Right**"), but not the obligation, to cause Grantor to sell all or a portion of the Shares, subject to the vesting provisions set forth in Section 1(b) below, at the Call Purchase Price (as defined in Section 2 of this Agreement). To secure this Call Right, Grantee shall pay a fee of $1,000.00 to Grantor (the "**Call Option Fee**").

(b) Vesting. The parties acknowledge that Grantee desires to incent Grantor to remain employed as the CEO of the Company. In order to do so, Grantee is therefore willing to reduce over time the number of Shares purchaseable by Grantee, dependent on the amount of time Grantor continues to serve as CEO of the Company. Accordingly, at the end of each consecutive three (3) month period during the Exercise Period in which Grantor has continued to serve as the CEO of the Company, Grantee's right to purchase one forty-eighths (1/48) of the Shares pursuant to the Call Right will fall away and no longer be applicable and such Shares will be considered to be "vested" and not subject to purchase by Grantee. Any Shares which have not vested are referred to herein as the "**Unvested Shares**", and the Unvested Shares constitute the Shares purchaseable hereunder from time to time by Grantee. For the avoidance of doubt, all of the Shares constitute Unvested Shares as of the date hereof. Further, if the Company is involved in the consummation of a Required Sale (as such term is defined in that certain Amended and Restated Stockholders' Agreement dated as of May 1, 2018 by and among the Company and its stockholders, as the same may be amended), the Call Right will no longer apply, but if and only if Grantee has consented to the Required Sale. It is acknowledged that Grantee retains the right to exercise the Call Right at any time prior to the consummation of any such Required Sale.

(c) Procedures.

1

(i)   If Grantee desires to purchase any of the Unvested Shares pursuant to Section 1(a), each time Grantee shall deliver to Grantor a written, unconditional, and irrevocable notice (the "**Call Exercise Notice**") exercising the Call Right, specifying the number of Shares to be purchased by Grantee.

(ii)   Grantor shall at the closing of any purchase consummated pursuant to this Section 1(c) represent and warrant to Grantee that (A) Grantee has full right, title and interest in and to the Unvested Shares which are the subject of a Call Exercise Notice, (B) Grantor has all the necessary power and authority and has taken all necessary action to sell such Unvested Shares as contemplated by this Section 1, and (C) the Unvested Shares to be purchased are free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, encumbrances or other restrictions or limitations of any nature whatsoever other than those arising as a result of or under the terms of this Agreement.  Prior to any such purchase Grantor shall not take any actions or omit to take any actions which would cause Grantor to be unable to make the foregoing representations and warranties at the closing of any such purchase.

(iii)   Subject to Section 1(d) below, the closing of any sale of Unvested Shares pursuant to this Section 1 shall take place no later than 90 days following receipt by Grantor of a Call Exercise Notice. The Grantee shall give Grantor at least ten (10) days' written notice of the date of closing (a "**Call Right Closing Date**").  For the avoidance of doubt, prior to a Call Right Closing Date, Grantee may assign its rights to purchase the Shares which are the subject of a Call Exercise Notice to an affiliate of Grantee.

(d)   Consummation of Sale. Grantor will pay the applicable Call Purchase Price for the Unvested Shares by certified or official bank check or by wire transfer of immediately available funds on the applicable Call Right Closing Date.

(e)   Cooperation. Grantor and Grantee each shall take all actions as may be reasonably necessary to consummate the sale contemplated by this Section 1, including, without limitation, entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

(f)   Closing. At the closing of any sale and purchase pursuant to this Section 1, Grantor shall cause the Company and its transfer agent to transfer the Unvested Shares to be sold to Grantee on the books and records of the Company.

2.   Call Purchase Price. In the event the Grantee exercises the Call Right hereunder from time to time, the purchase price per share at which Grantor shall be required to sell the Unvested Shares (the "**Call Purchase Price**") shall be equal to $14.28.

3.   Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 3).

If to Grantor:

34 Selby Lane
Atherton, CA  94027
jon@ProlificIdeas.com

If to Grantee:

619 West Comstock Street
Seattle, WA  98119
abconru@yahoo.com

4.  Entire Agreement. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

5.  No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

6.  Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

7.  Amendment and Modification; Waiver. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

8.  Severability. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

9.  Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other

jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of California. Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of California, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

10. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall together be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

11. <u>Compliance with Laws and Regulations</u>. The exercise of the Call Option shall be subject to compliance by Grantor and Grantee with all applicable requirements of law, including federal and state securities laws.

12. <u>No Strict Construction</u>. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

13. <u>Stockholders' Agreement Amendment</u>. Upon Grantor obtaining the Shares pursuant to the Purchase Agreement, Grantor and Grantee agree that they will execute an amendment to the Amended and Restated Stockholders' Agreement dated as of May 1, 2018, as amended on the date hereof (the "**Stockholders' Agreement**"), to amend and restate certain definitions, Section 2.8 and Articles VIII and IX, and make an additional amendment, all as provided in the attached <u>Exhibit A</u>, which is incorporated by reference herein.

IN WITNESS WHEREOF, the parties hereto have executed this Call Option Agreement on the date first written above.

*[signature]*
Jonathan B. Buckheit, Grantor

*[signature]*
Andrew B. Conru, Grantee

EXHIBIT A

1.     The following terms in the Stockholders' Agreement will be amended and restated in their entirety to read as follows:

"**Designated Holders**" means (i) Buckheit and his Affiliates so long as they own at least 50% of the Voting Shares that Buckheit acquired from Kestrel I and Kestrel II and (ii) Andrew B. Conru and his Affiliates, for so long as they continue to own at least 50% of the Voting Shares that they held as of the consummation of the Restructuring.

"**Majority of the Minority Stockholders**" means, at any time that the Majority Stockholder owns 30% or more of the Voting Shares, (i) (a) Andrew B. Conru and his Affiliates and (b) holders of at least 20% or more of the Voting Shares held by Persons other than (y) Buckheit and his Affiliates and (z) Andrew B. Conru and his Affiliates, or (ii) holders of at least 80% of the Voting Shares held by Persons other than (w) Buckheit and his Affiliates and (x) Andrew B. Conru and his Affiliates.

"**Majority Stockholder**" means Buckheit for so long as he or any of his Affiliates (a) collectively are the largest holder of the Voting Shares and (b) collectively own 30% or more of the Voting Shares.

2.     Section 2.8 and Articles VIII and IX of the Agreement will be amended and restated in their entirety to read as follows:

"**2.8    Voting Provisions Regarding Board of Directors**.

(a)     Size of the Board. Each Stockholder agrees to vote, or cause to be voted, all Voting Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as will be necessary to ensure that the size of the Board will be set and remain at four directors, unless and until Stockholders holding, in the aggregate, at least 75% of the outstanding Voting Shares approve otherwise. Currently, the Class 1 Directors (as defined below) shall be Marcin Narozny and an individual to be designated pursuant to Section 2.8(b)(i) and the Class 2 Directors (as defined below) shall be [Ezra Shashoua] and Jon Buckheit (collectively, the "**Current Board**").

(b)     Board Composition. Each Stockholder agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as will be necessary to ensure that at each annual or special meeting of Stockholders at which an election of directors is held or pursuant to any written consent of the Stockholders, for the election of each of the members of the Current Board until any such members no longer serve, and thereafter for the election of any successors in accordance with the following:

(i)     for so long as Andrew B. Conru continues to be a Designated Holder, Andrew B. Conru shall have the right to designate two members of the Board (the "Class 1 Directors"); provided that, following such time that Andrew B. Conru ceases to be a Designated Holder, the Stockholders other than Buckheit shall have the right to designate the Class 1 Directors at the next annual or special meeting of Stockholders at which an

1

election of directors is held and at each subsequent election; and

    (ii)    for so long as Buckheit continues to be a Designated Holder, Buckheit shall have the right to designate two members of the Board (the "Class 2 Directors"); provided that, following such time that Buckheit ceases to be a Designated Holder, the Stockholders shall have the right to designate the Class 2 Directors at the next annual or special meeting of Stockholders at which an election of directors is held and at each subsequent election.

    (c)    <u>Removal of Board Members</u>. Each Stockholder also agrees to vote, or cause to be voted, all Voting Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as will be necessary to ensure that:

    (i)    Andrew B. Conru may remove and replace any Class 1 Director and Buckheit may remove and replace any Class 2 Director for such period of time that such Person is a Designated Holder; and

    (ii)    any vacancies on the Board shall be filled pursuant to the provisions of Section 2.8(b).

All Stockholders agree to execute any written consents required to perform the obligations of this Agreement, and the Company agrees at the request of any party or parties entitled to designate directors to call a special meeting of stockholders for the purpose of electing directors.

    (d)    <u>No Liability for Election of Recommended Directors</u>. No Stockholder, nor any Affiliate of any Stockholder, will have any liability as a result of designating a person for election as a director for any act or omission by such designated person in his or her capacity as a director of the Company, nor will any Stockholder have any liability as a result of voting for any such designee in accordance with the provisions of this Agreement.

    (e)    <u>D&O Insurance</u>. The Company shall procure directors and officers liability insurance on customary and commercial terms, providing for coverage of all directors in an amount no less than $10,000,000.

    (f)    <u>Director Compensation</u>. Unless otherwise agreed by (i) a majority of the Board and (ii) the Requisite Stockholders, each director will be compensated at the same rate. The Company shall reimburse the reasonable expenses incurred by each director in such capacity. Nothing herein shall prohibit the Company from separately compensating non-employee directors for other services.

**ARTICLE VIII**
**AMENDMENT AND WAIVER**

**8.1**    <u>**Amendment**</u>**.**

Except as otherwise provided herein, the terms and provisions of this Agreement (including the schedules hereto) may only be amended, modified or waived pursuant to a writing signed by each of (a) the Company and (b) (i) for so long as each of (x) Andrew B. Conru and his Affiliates continue to be a Designated Holder and (y) Buckheit and his Affiliates continues to hold at least 60% of the Voting Shares that they hold after acquiring such Voting Shares, then at

2

least 60% of the outstanding Voting Shares or (ii) from and after such time, Stockholders who, in the aggregate, hold at least 75% of the outstanding Voting Shares.  Notwithstanding the foregoing, the veto rights of the Majority of the Minority Stockholders with respect to a Sale of the Company or a Specified Asset Sale contained in Section 2.4 shall not be amended without the consent of the Majority of the Minority Stockholders at any time that the Majority Stockholder owns 30% or more of the Voting Shares.

**8.2    Waiver.**

No course of dealing between the Company and the Stockholders (or any of them) or any delay in exercising any rights hereunder will operate as a waiver of any rights of any party to this Agreement.  The failure of any party to enforce any of the provisions of this Agreement will in no way be construed as a waiver of such provisions and will not affect the right of such party thereafter to enforce each and every provision of this Agreement in accordance with its terms.

## ARTICLE IX
## TERMINATION

The provisions of this Agreement, except as otherwise expressly provided herein, will terminate upon the first to occur of (a) the dissolution, liquidation or winding-up of the Company; (b) a Sale of the Company, or (c) the approval of such termination by each of (i) the Company, (ii) (x) for so long as each of (1) Andrew B. Conru and his Affiliates continue to be a Designated Holder and (2) Buckheit and his Affiliates continue to hold at least 60% of the Voting Shares that they hold after Buckheit acquired such Voting Shares, then at least 60% of the outstanding Voting Shares or (y) from and after such time, Stockholders who, in the aggregate, hold at least 75% of the outstanding Voting Shares, and (iii) the Majority of the Minority Stockholders. The provisions of this Agreement, except as otherwise expressly provided herein, will terminate upon the consummation of a Qualified Public Offering; provided, however, that Article IV (Registration Rights), Article VIII (Amendment and Waiver), this Article IX (Termination) and Article XI (Miscellaneous), and to the extent required for the foregoing provisions, Article I (Definitions; Rules of Construction), will survive until it is agreed to terminate such provisions by Stockholders who, in the aggregate, hold a majority of the outstanding Voting Shares agree to terminate such provisions.  Following a Required Purchase Offer, if any Stockholder holds directly or indirectly, more than 92.5% of the outstanding Company Equity Securities then all provisions of this Agreement are terminated except Section 2.3 (Co-Sale Rights), Section 2.9 (Required Purchase Offer), Article VIII (Amendment and Waiver), this Article IX (Termination) and Article XI (Miscellaneous), and to the extent required for the foregoing provisions, Article I (Definitions; Rules of Construction).  Notwithstanding anything contained herein to the contrary, as to any particular Stockholder, this Agreement will no longer be binding or of further force or effect as to such Stockholder, except as otherwise expressly provided herein, as of the date such Stockholder has Transferred all of such Stockholder's Company Equity Securities."

3.    Section 11.8(a) of the Agreement will be deleted in its entirety and replaced with "Intentionally omitted."

4026475_6